And we'll turn to the second case on our calendar, United States v. Micael. May it please the Court, Your Honor. Good morning, my name is Steven Proziosi, I represent the appellant, Mr. Jean Pierre Micael. Your Honor, the statute of limitations had expired by the time the original indictment was filed in February of 2014. It was admitted at trial and undisputed that there had been no transactions, no drug transactions between 2009 and 2014. That means the government was obligated to prove beyond a reasonable doubt that the conspiracy endured past February 27th, 2009. There was no credible evidence that that occurred. What the government pointed to at trial was that there was a phone call between Mr. Sammy Chartouni and my client, Mr. Jean Pierre Micael. And that phone call discussed a Mr. Eric Connori and the fact that Sammy Chartouni owed money to Mr. Connori. Government claims that this was, this phone call, the objective of this phone call, was to conceal the conspiracy. And therefore, they argue that the conspiracy endured past February 27th, 2009. And that the statute of limitations was not up when the original indictment was filed. I- It's only looking back to actions after February 2010, and would include some of the transactions that were shown to have occurred in 2013 and 14. The reason I bring it up, Your Honor, is because the superseding indictment must relate back to the original indictment. And the rule- Why can't it just stand on its own if it's only looking back to actions past 2010? Well, the rule is that in order for the superseding indictment to relate back to the original indictment, there must have been a validly pending indictment, and it cannot materially broaden the original indictment. And my argument is that there was not a validly pending indictment. The original indictment was not validly pending when the superseding indictment was filed. And, in addition to that, the superseding indictment materially broadened the original indictment in that it brought additional charges, and for several other reasons I would like to get into, and I cited, Your Honor- Wasn't the jury charged on this issue, and didn't they find that the conspiracy lasted after, or continued after February 27th, 2009? And that's why I couched my first point in the Rule 29 motion of the court. The trial counsel at the end of the trial, starting at page 846 of the record, made a Rule 29 motion. Asking the court to dismiss because of the statute of limitation of the original indictment was up by February 27th, 2014. And then when the superseding indictment was filed on February 13th, 2015. Your Honor, my argument is that the original indictment was not validly pending when the superseding indictment was filed. So no reasonable jury could have found it, is that what you're saying? Yes, that is what I'm arguing. And, Your Honor, that there was a material broadening of the superseding indictment as juxtaposed to the original indictment. And I cited the Salmonese case, Judge, and I just want to very quickly touch upon a couple of points that the Salmonese case, that was a second circuit case, went through. And it said, what constitutes material broadening is when there are violations of a different statute, which we have in this case, in the superseding indictment. It contains different elements, which we have in this superseding indictment. It relies on different evidence, which of course we have. They tried to extend it to all the way from 2009 to 2014, and it exposes him to a greater sentence. And of course we have that. But this would mean that the superseding indictment couldn't resurrect claims that were already gone. But as Judge Carney asked a few minutes ago, why can't the superseding indictment stand on its own? Why does it have to relate back to something? Because the original indictment was not validly pending. So first they have to prove that the original indictment was validly pending, and it was not. But that's only if, go ahead. That's only if they want to convict for actions taken before the statute of limitations would rule them out on the superseding indictment. But there are actions that suggest criminal liability within the statute of limitations as set by the superseding indictments filing date. And your honor, the reason I'm arguing this is the original indictment alleged a conspiracy from 2003 to 2009. The superseding indictment extended that, temporarily, the conspiracy more than five years up to 2014. Therefore, and admittedly, there were no transactions between 2009. We have this gap, this break from 2009 to 2014. So now, they are alleging that the conspiracy was extended by transactions that occurred in 2014. And they're saying that's part of the same conspiracy. This is what the government is arguing. They point to some actions also in 2012 that Certuni introduced Mikhail to Doug as a supplier in California. This is what the government is arguing. There were some final drug deals in 2013 and 2014. Yeah, there's no evidence that that took place. It's Mr. Certuni's testimony that he thinks he remembers something occurred. Mr. Certuni's memory is horrible throughout this. If you read his testimony, Mr. Certuni is a severe drug addict and heroin addict who has trouble remembering that he was robbed. He has trouble remembering he had a concussion. He has trouble remembering- The jury heard all this, right? Yeah, the jury heard all this. But again, this is in the context of the Rule 29 motion, and the trial court ruled on this. And now we have to decide whether or not this superseding indictment materially broadens the original indictment. That is precisely what it does. Your argument seems to hinge on this being a two-person conspiracy between your client and Certuni. But that's not how it's charged, right? It hinges on the fact that Mr. Certuni was the center of the conspiracy. He was the person who conscripted all the suppliers. He was the person who referred to my client as one of his customers. Well, at one time. But the conspiracy, at least in the jury's view as I understand it, continued with your guy taking Certuni's role, and then Certuni coming back in later on down the road, right? Why isn't that? There's no evidence of any transactions. After Mr. Certuni cut off- There's no evidence of any transactions between Certuni and your client, right? Or anybody else. The testimony of Certuni was, he told me that he was doing other transactions, and that was the extent of it. That's not proof beyond a reasonable doubt that there were other transactions. It was Mr. Certuni who conscripted all the suppliers. Everything flowed through Mr. Certuni. It was Mr. Certuni who had more than $5 million worth of cash and gold in his front yard. Didn't your client explore other suppliers after he ended his connection with Certuni? The testimony was, according to Mr. Certuni, I spoke with him. He said there were other suppliers. I don't know their names. He doesn't know about any transactions. He didn't know, there was no evidence other than he told me. That was the extent of the evidence. And my argument is, Judge, that that's not evidence beyond a reasonable doubt. Because Certuni is so incredible. Yes, in part. And if you read through his testimony, it is incredible, because of the fact that he, and I tried to list all of this in my brief, Judge. All of the problems he had with the heroin addiction, and well, I'll leave that for the rest of my. When you come up later, you directed us to A46 of the record, to which I promptly turned, and I'm not sure what the relevance of A46 is, but you'll tell us. 846. 846 is where Mr. Bondi begins his Rule 29 motion. Okay. Your honors, may it please the court. My name is Jonathan Cohen. I represent the government, and I was one of the trial attorneys at trial for Mr. McHale. The district court did not air in denying the appellant's Rule 29 motion as to statute of limitations. First, the original indictment, there was nothing improper about that. The jury heard abundant evidence of drug dealing late into 2009 and even past that. Second of all, as Judge Carney has discussed, the relevant indictment for trial was the superseding indictment, not the original indictment. And the government does not need to rely on the relation back doctrine here, and does not do so. In our view, the conspiracy continued until 2014, and because of that, there's no statute of limitations problem. Could you address why this wasn't two conspiracies? I was having difficulty with the notion that Mr. Chartouni actually continued with the defendant, having whom the evidence seemed to suggest that he was upset that he was owed so much money and he severed relations insofar as a cousin can do that. And then Mr. McHale proceeded on his own with other people pursuing the same activity. But still, Chartouni seemed to have withdrawn. And it seemed to me that he was then entering into a number of other conspiracies to sell and distribute marijuana. But there wasn't much basis after 2009, early 2009, for finding Mr. Chartouni was participating. So it looked to me like a sequence of conspiracies rather than one continuing. So what am I overlooking in that? I can address that absolutely, Your Honor. Just because a conspiracy changes in phase does not convert it from a single conspiracy into multiple conspiracies. And here our position is that the conspiracy changed in phase when Mr. Chartouni was unwilling to sell Mr. McHale marijuana on consignment. But the conspiracy still has at its base an agreement. So you have to have two people. We're not talking about a Rico Enterprise or something like that. This is a conspiracy charge. And if one of the people who entered into the agreement withdraws, and let's presume that he actually did withdraw as he said, is it the same conspiracy if one of those individuals continues in the same line of business, if you will, with new partners? Is that really the same conspiracy? First, Your Honor, I understand the hypothetical. That's certainly not what we're arguing. Neither party withdrew. The bar for withdrawal is extremely high in the Second Circuit. And I have many reasons why neither Mr. Chartouni nor Mr. McHale withdrew. But help me with that because it looked to me like there was at least a plausible argument that he did. They severed relationships and then Mr. McHale pursued the sale of marijuana on his own with other people. I believe the record is clear that there was evidence that they did not sever their relationship. They were, Mr. McHale was based in Connecticut. Mr. Chartouni was based from around 2010 on in California. Even after that trip- Let's come back to that, but I want to understand your position about whether that would be still a simple conspiracy. Our position is it would still be a conspiracy. That's because- That's because even at the time that, under your hypothetical that Mr. Chartouni withdrew, Mr. Chartouni knew that Mr. McHale had additional co-conspirators who were working to distribute the product. The fact that Mr. Chartouni had made the original agreement, withdrew, but knew that his former partner was continuing means that that was a single conspiracy continuing. Just his knowledge. The fact that the jury had evidence of other co-conspirators who were properly deemed part of the conspiracy at the time of Mr. Chartouni's withdrawal, his buyers, for instance, didn't immediately disappear. And it can be presumed that those same members, there's no evidence of withdrawal. I think the better answer to your Honor's question is that there is no evidence of withdrawal. It's an affirmative defense. Conspiracy is presumed to continue unless the goal is abandoned. I just want to understand your position on the law about whether you need to have any agreement that remains in effect. I think the object was to sell marijuana. Even well into late 2009, there's abundant evidence for many of the co-conspirators that there are other co-conspirators working towards that objective as a broader organization. And am I correct in understanding that there were suppliers that would bridge the gap if Chartouni did withdraw? There are suppliers to Chartouni who became suppliers to your client, to the defendant. That's absolutely correct, and we know that from two sources. One is, from two incidents. One is when the defendant gets introduced to Mr. Dunning about two and a half hours north of San Francisco, where Chartouni is introducing him to a supplier so that he can continue to sell marijuana. And we also know that on the repeated visits that Mr. Chartouni made back to Mr. McHale. They spoke about the marijuana business, and Mr. McHale confirmed to Mr. Chartouni he had other suppliers. So those are sources to know that it was a continuous operation. But I think the Second Circuit's law on withdrawal and continuing conspiracies is the most important thing here. The bar is extremely high. The burden is on the defendant to show withdrawal of either, take Mr. Chartouni or Mr. McHale. Either one of those individuals would have to have made a clean breast to authorities, which neither did at any point. Either would have to, or in the alternative, to be fair to the defendant, either individual must communicate the abandonment in a manner reasonably calculated to reach co-conspirators. Neither McHale nor Chartouni took either of these steps, and Mr. McHale continued to participate in it. So another requirement is that a co-conspirator does not get additional later benefits and take additional conduct to participate in the conspiracy, and the defendant did that here. Not only the deals in late 2013 and 2014, where there's two large marijuana deals, and the count to conduct is around the same time, not part of that same conspiracy, so I'm not including that. But that conduct, McHale clearly got a benefit and clearly participated in the conspiracy. And those two reasons, the fact that he did either one of those two things would have meant that he did not withdraw from the conspiracy. And I think it's also important to see the broader picture here. These are two individuals who worked together for years and years, over 11 years on the indictment. But as your honors know, even more time than that. And they were always trying to sell marijuana. They were working together a lot of the time. There was a phase where Mr. Chartouni was not- Five year phase. Your honor, I would say that it's much closer to between 2010 and the meeting with Mr. Dunning in, well, okay. Between 2010ish and the first of the later marijuana deals in late 2013 or 2014. That point is certainly correct, your honor. But they were working together this entire time. He's seeing him on the trips back to the east coast. He's staying in contact with him. McHale was running Mr. Chartouni's business for a period of time early on. They're clearly working together. One thing we haven't talked about is there's a discussion where Mr. McHale's getting advice from Mr. Chartouni about a camera that he believes law enforcement has outside of his house. That's around the time that Mr. Chartouni left for California in 2010. And the phone call, we respectfully disagree with the appellant's view of that phone call. That phone call is certainly after June 2009, which is the arrest of Mr. Connori, it's either 09 or 010, and it's clearly they're acting and Mr. McHale's participating- I'm going to interrupt for just a second. Could you take a minute and address the oxycodone count? As I understand it, Mr. Chartouni testified that he was pretty sure that the pills that Mr. McHale gave him were oxycodone. But that seems weak for a finding beyond a reasonable doubt. What can you tell me to reassure me? A few things, Your Honor. His testimony was he took those pills. He would have a basis for believing it's oxycodone. There was a colloquy with Judge Stein about markings on the pills. And that was properly before the jury to decide. There was quite a bit of discussion about those pills. As far as- We took them and there were markings on them, and that's what led him to think he was pretty sure. And there's- I believe that's the case, Your Honor. Yes. Thank you. I'll rest on the papers unless either of Your Honors has any questions. Let me take you back to the first indictment. Opposing counsel has suggested that it was invalid in some sense, or for a period of time. How do you address that? Your Honor, the original indictment, all of the evidence in late 2009 would render that argument meritless. Mr. Karankowitz, who if Your Honors remember, is somebody who's working most closely with Mr. Wells, but also with Mr. McHale, was adamant that the last drug deal he did with Mr. McHale was in late 2009. So that there alone, the phone call after June 2009 with Mr. Kennory is yet another incident. The camera discussion between Mr. McHale and Mr. Chartouni. Opposing counsel has a view that this- Well, your view, I believe, is that it's irrelevant, the first indictment, right? That's correct, Your Honor. Why is it irrelevant? Because we're, at least as far as statute of limitations purposes, this conspiracy was a single conspiracy, so if any of the deals, any overt acts in furtherance of the conspiracy occurred within the time of the superseding indictment, then that would be brought timely to 2000- Excuse me, wasn't the jury instructed that it could look back to 2009 instead of 2010, though? I believe, if that's Your Honor's recollection, I won't dispute that. I think that's right, and that concerned me, because I had conceived of the superseding indictment as the operative one. And that would mean 2010 was the relevant date. I assume you're correct on that, Your Honor, and taking that as fact, our argument, if that's the case, would be that to the extent the superseding indictment was brought and did not expand the conduct that was prior to 2009, what it expanded was the time period from 2009 to 2014 to include the later transactions, the late 2013 transaction and the 2014 transaction. Expanded only that which was within the statute of limitations. Yes, Your Honor, and I suppose to be careful, I should say that to the extent Your Honors indulged that line of questioning, I should say that we would be relying on the relation back doctrine in connection to the extent Your Honors believe that that is relevant because of the date under which the jury was instructed. Yeah, I'm looking at the jury instruction that says the government must prove beyond a reasonable doubt that the charged conspiracy continued to exist after February 27, 2009. Is what I have in front of me anyway, so. Understood, Your Honor. Thank you. Thank you. Thank you. Your Honor, I wanted to touch upon one of the questions you had asked about the sufficiency of count two with the oxycodone. Mr. Chartouni specifically testified in the record at page A184 that he could not identify the pills as oxycodone. He could not identify the markings. He could not identify the weight of those pills. So, point three in my- He was pretty sure that they were, right? Yeah. Mr. Chartouni was unsure about a lot of things. And Your Honor, in that time frame, in that period, Mr. Chartouni testified that he was taking approximately 30 to 50 bags of heroin per day. And that the oxycodone pills he had, and remember the time frame, he was supposedly, his alleged sale of these oxycodone pills occurred on March 11th. And he was arrested on March 18th without any pills. So, Mr. Chartouni's testimony is that he was taking, on a cross country trip, he was taking 30 to 50 bags of heroin per day, and he finished all the oxycodone pills. So, about 30 oxycodone pills per day as well. So, this is the context of Mr. Chartouni's testimony. And this is one of the reasons that I understand that the government sometimes must rely on some nefarious characters. But I think this is a stretch that- Aren't there text messages referring to the oxycodone? No, none. None of them mention the oxycodone at all. And Mr. Chartouni testifies that he wasn't sure of the weight, he wasn't sure of the markings on the pills. And there was, and Your Honor- Text messages refer to something, but not oxycodone by name. Is that what you're saying? There was a lot of text messages regarding the marijuana transaction. And one of the things I tried to do in my brief, Your Honor, is juxtapose these two simultaneous transactions of marijuana and the oxycodone. And Mr. Chartouni was very emphatic about all of the things that went into the transaction of the marijuana. The price, the quality, the quantity, the packaging, where the transaction would take place, when he was leaving, where he would park. What's wrong with that? And juxtaposing that to the oxycodone, the marijuana transaction, Your Honor, street value of $1,750. The oxycodone transaction, street value of $4,000, and there wasn't a word. Not a word, not a conversation, not a text message. The government had the phone they are ascribing to my client. They didn't follow him anywhere to prove that he went and purchased these oxycodone pills. There wasn't any conversation, any text messages, nothing. And juxtaposing two simultaneous transactions that Mr. Chartouni was so careful to enlist all of the details of the marijuana transaction. That was worth less than half of the price of the oxycodone. And there wasn't one word, not one text message, nothing. Well, your friends on the other side say that there were some text messages on the same date that he supposedly provided them the oxycodone. Chartouni sends McHale a text that reads, I would actually take it all, everyone, but you're scaring me. Hope you're not trying to kill me. I was just thinking maybe I shouldn't have told you about those. And Judge, I addressed this in my brief. The pronoun those that Mr. Chartouni is using is interchangeable between the marijuana and what the government is asserting were the oxycodone pills. Wouldn't those refer to pills? Rather, I mean, I- Well, no, Mr. Marijuana is those. That was Mr. Chartouni's testimony, Judge. That's what I'm referring to. Your Honor, so I see I'm past my time. Your Honor, I would ask that my brief be marked and submitted. Thank you very much. We reserve the decision and we thank you both. Thank you, Your Honor.